It's a pleasure to hear from Mr. Lawrence. Good morning. May it please the Court, I'm Henry Lawrence. I represent the defendant, EQT Production Company. EQT seeks relief from an order granting summary judgment entered by the lower court in alternative format. First, EQT asks the court to review the question of jurisdiction and determine where there is a lack of diversity jurisdiction. The matter should be remanded to the trial court with directions to enter judgment of dismissal where jurisdiction is not in existence. Alternatively, EQT asks the court to reverse the grant of summary judgment entered by the trial court and enter summary judgment in favor of EQT. Finally, EQT asks alternatively for the court, if it determines that summary judgment is not appropriate, to set aside summary judgment and remand the matter for further proceedings before the trial court on the issue of whether or not Plaintiff Prima is a good-faith bonafide purchaser. This matter centers around a title dispute arising from development, recent developments of the Marcellus Shale in north-central West Virginia. This matter stems and focuses on the issue of who owns the gas rights under a lease that was entered into in 1892. The parties do not contest that the oil rights under this lease are in favor of the plaintiffs, in favor of Prima and the other plaintiffs. Factually, in 1892, a lease was entered into between Mr. Blackshear and the South Penn Oil Company. That lease was an oil and gas lease provided for production of oil and gas from the mineral owned by Mr. Blackshear. Several years after that, nine years after that, and ten years after that, South Penn entered into indentures whereby they assigned the gas rights under this oil and gas lease to predecessors of EQT. Those assignments were not recorded. That gives rise to the issue that is before the court and was before the lower court. There is no requirement in West Virginia for documents conveying title to be recorded. However, if they are not recorded, then the court must look at whether or not the subsequent purchaser had actual notice, constructive notice, or inquiry notice of that transfer. Following the indentures in 1901 and 1902, there was an assignment, or a working agreement, entered into between South Penn and Hope Natural Gas Company. Under the terms of that working agreement, the parties agreed that they would jointly develop the 3,800-acre lease. If South Penn drilled a well that was a gas well, then South Penn would give the option to Hope Gas Company to take over operations of that gas well. Alternatively, if Hope drilled an oil well, then the option was offered to South Penn to operate that as an oil well. The working agreement between the parties outlined how they would jointly develop the acreage and how they would jointly drill wells, pay royalties, and produce oil and gas from that property. As I indicated earlier, the 1901 and 1902 indentures were not recorded, but they became the existence of those conveyances.  that existed among the title attorneys in north-central West Virginia. Isn't the purpose of the recording statute so that you don't have to go around and find people who have lived in the community for 70 years and ask them what they think about the title? The purpose of the recording statute is to provide notice when documents are recorded. There is no requirement that the documents be recorded to affect the conveyance. Is the law in West Virginia that if you don't have, if a document's not in the chain of title and you don't know anything to put you on notice, that that title's no good? That you can be a BFP without having to do anything else? The law in West Virginia is when a buyer has reasonable grounds to believe that there is an unrecorded conveyance that previously conveyed the interest they are purchasing. So the test is, is there a reasonable grounds to believe that there is an unrecorded document? If that arises, then the prospective buyer is required to use reasonable diligence to determine if a prior conveyance existed. What does legend and lore mean? That legend and lore relates to the unrecorded assignment of the gas rights from South Penn to Hope Natural Gas Company. The legend and lore was that there existed... Is that a term of art in West Virginia title law? Legend and lore? Or is it just what you've, I think, accurately described in this case as the legend and lore of this title? I don't know the origination of the terminology. I have heard it referenced. I don't understand. I mean, I find myself with the same qualms as Judge Knee here. And the appeal seemed to me to have the potential of simply unwinding the efficacy of the recording statutes and the certainty that they bring to property holdings and property law. One of the more than contract and certainly more than tort, but perhaps even more than contract, property law depends upon settled understandings and a degree of precision and certainty about who owns what. And maybe this is a simplistic way for me to look at it, but TransEnergy or Primo seem to have an unbroken, legally recorded chain of title from 1892 to the present. And you come in there with a wide bead, which is untraceable to the plainest recorded title. And it just seems to me we accept your view and throw settled, recorded understandings on which people rely on all their transactions and all their affairs into question. And that's where, and that was just after reading this, that's just where I thought we were going, is that against an unbroken, legally recorded chain of title, you're just throwing in some hearsay and a wild deed. Your Honor, that is one way of looking at this. We contend that the legend and lore and the actual document that was recorded put the plaintiffs on notice that their acquisition was of oil rights only. And the West Virginia Supreme Court, the Northern District of West Virginia, in recent decisions, have noted the bona fide purchaser inquiry, the due diligence requirement, that if there is an unrecorded document... Well, if we went that far with you, why wouldn't Primo be a bona fide purchaser here? I mean, the district court found, because of the factual matter, that it did due diligence, it did a public record search. I've had an agent, a lawyer, I think his name was Mr. Starkey, he actually visited courthouses and reviewed the documents, and then they visited the Black Shear lease itself. So if you do all these things, and that doesn't amount to due diligence, and that's not sufficient to make somebody a bona fide purchaser, doesn't that add an additional difficulty to your position? We don't believe that it does, Your Honor, because the same Mr. Starkey, in a subsequent assignment from the same client, found the very deeds, found the very instruments that conveyed the gas rights to EQT. He testified that he did an abbreviated, essentially a bare-bones review to determine if the lease had been transferred, the leasehold rights had been transferred from Pennzoil to Cobham. When TransEnergy and Primo were preparing to drill a $6 million Marcellus well, he then discussed with his client, the legend and lore, and did a complete title search, at which time he found the severance of the oil and the gas interest. We also submit that the due diligence, the court in looking at the due diligence, must look at the actual document that was recorded in the conveyance from Pennzoil to Cobham. The lower court... transferred the... I'm thinking about the... I guess it's the 1996 memorandum that transferred the interest from Pennzoil, which was the direct successor in interest to South Penn, and then it transfers it to Cobham. And I was under the impression, just from reading that, that it transferred both oil and gas rights at that 1996 memorandum from Pennzoil to Cobham, transferred both sets of rights. Your Honor, the lower court agreed with plaintiffs in that regard, but the lower court did not address the specific language that's in the memorandum of assignment, wherein Pennzoil... Well, the specific language is that it conveys all right title and interest. Correct. And that's pretty much the whole kit and caboodle, isn't it? All right title and interest it may have in and to certain oil and gas leases, and 90, it was changed to 88 wells, and then it references Exhibit A and Exhibit B. The court below said the reference to oil and gas leases necessarily meant that the gas rights were transferred with the oil rights. But if you look at the exhibits, the court said Exhibit A pertains only to the leases, Exhibit B pertains only to the wells. There is no such labeling on Exhibit A or Exhibit B, and specifically, the only reference the memorandum says conveys the right that Pennzoil may have. The only reference in either of the exhibits to right is in Exhibit B, which lists both the leases and the wells. Under the column that is entitled Rights for the Black Shear for this specific lease, this document specifically says oil, indicating that the rights conveyed under the lease, under the oil and gas lease, the rights conveyed by Pennzoil were only the oil rights because that is all it had. In 1901 and 1902, it had conveyed away the gas rights. The lower court said it believed that the reference to rights only pertained to the wells. But specifically, if you look at the Exhibit B, there are 29 wells, two were excluded, there are 27 wells listed. The rights are only listed in one location consistent with the lease. There are not 29 separate entries under rights for each one of the individual wells. In looking at the interpretation or the reading of this document to convey the rights that Pennzoil had to Cobham, the only rights that are identified with respect to this lease are the oil rights. And next to other leases that are listed on Exhibit B, very clearly it says O and G, oil and gas rights. But with respect to this Black Shear lease, the only reference is to the conveyance of oil rights. We submit to the court that the only interpretation of this memorandum of assignment is that the rights that were conveyed were the oil rights. Let me ask you a question about the jurisdictional issue in this case. Is the information that has been provided to this court in affidavits true? My time has expired. May I respond? Sure. We have no reason to disbelieve what has been submitted in the affidavits with respect to the jurisdiction or the membership in both the LLC and in the limited partnership. And if Republic essentially waives any right to complain about any harm in this case or receive any benefit from this case directly, why are they not dispensable? Under the law in West Virginia, any party that has an ownership interest in property is an indispensable party to the proceeding. That is the O'Daniels case. While the Fourth Circuit has not specifically addressed it, the Fifth Circuit has addressed this in the Humble Oil case and indicated that an overriding royalty interest owner is an indispensable party. And the waiver of there is no provision for a party to waive any recovery or waive any claim after coming before the court. All right. Thank you, sir. Thank you. Mr. Hogue, we're pleased to hear from you, sir. Good morning, Your Honors, and may it please the Court. I represent just the two Republic entities. These are the only parties whose citizenship has been put at issue, so I will just briefly argue jurisdiction. My colleague, Mr. McMillan, will argue the remaining merits issues on behalf of all four plaintiffs. EQT lost in federal court, so it wants to throw out that entire judgment and start all over again in state court based on a jurisdictional issue that is easy to cure and prejudiced absolutely no one. Is this the first time it's come up? Yes. Well, there have been a number of courts. I mean, it's essentially what happens is sometimes a party loses a case and then they come up and raise a jurisdictional issue, and very often dealing with complete or incomplete diversity. And it's almost like sort of seeking a dismissal of a case long after the time for dismissal has expired. And a lot of courts have said, you know, when the parties have put this much effort into a case, the district court has put this much into a case, and something has gone on for this long to try to go up on appeal after you sort of sandbag the district court and raise the jurisdictional issue. We're not just going to throw out all that effort, unwind the clock, make the state courts sort of go through it and add to their burden and everything. At a certain point in time, a bit of practicality takes over, does it not? Absolutely practicality must take over. As Your Honor has noted, as Judge Gregory has noted, and many other members of this court have noted, what they're asking for, this dismissal of the entire case, is, and I quote, a drastic remedy which should be only employed sparingly. And there's no need for that drastic remedy here. It's very easy to cure this jurisdictional issue, just two steps. You dismiss REV under Rule 21, because REV is not indispensable under Rule 19b, and then you can amend the complaint under that undisputed affidavit. Courts do approach this type of situation with a very forgiving posture. The Supreme Court noted in Provident Bank that under Rule 19 we reject an inflexible approach and instead favor pragmatic considerations. Likewise, in Newman Green, the Supreme Court said that we favor, under Rule 21, favor dismissal of specific parties rather than the entire case, because we don't want unnecessary and wasteful re-litigation for the sake of hypothetical, I'm sorry, hyper-technical jurisdictional purity. We would submit that three aspects of this case make this particularly easy for avoiding this drastic remedy that EQT wants. First, the key issue in all these cases that we've talked about, that Your Honors referred to, is the lack of prejudice. REV will not be prejudiced by being removed from this case. To the contrary, REV is asking to be removed from this case. Nor will EQT be prejudiced by removing REV from this case, due to res judicata. REV agrees that its interests are fully represented, fully protected by RP, by the partners, so it's bound by the judgment and is stopped from asserting otherwise in a future case. Moreover, you can bulletproof this result simply by dismissing REV with prejudice, if you want, exactly what the Supreme Court endorsed in Newman Green. Second, as Your Honor noted, EQT didn't raise any of these issues in the district court, didn't raise it until it lost. So the concern is tactical, not substantive, and this is exactly the kind of tactic that the Supreme Court condemned in Provident Bank, when it said that making a dilatory jurisdictional argument in an attempt to, quote, obtain a windfall escape from its defeat at trial. Finally, here, as in Provident Bank, the case has already been litigated to final judgment, as Your Honor alluded, so efficiency strongly favors finding a way, if we can, to preserve the judgment. Their only argument is that REV has an interest in the lease. But so what? Having an interest does not make you indispensable. It just means that you can be a plaintiff. It says nothing about whether you must be a plaintiff under 19A, let alone whether your unavailability shuts down and requires dismissal the entire case under 19B. The issue is not eligibility to be a plaintiff, but indispensability. I think we understand you on that. Thank you, Your Honor. If there are no further questions, sir. Now, Mr. McMillan, we'll hear from you. Good morning, Your Honors. May it please the Court. My name is Stuart McMillan, and I represent the Appalachians in this case. Your Honors, Judge Stamp got this absolutely right when he quieted title in this case. This case had been pending for two years, or 18 months, and he looked and did what you do in a quiet title action. He looked at the respective parties' chains of title. He ran title for each, and he found that the Appalachians from 1892 had an unbroken, clear chain of title that gave them the rights to oil and gas, black share lease. The Court noted where EQT got its interest, noted that it was from an unrecorded 1902 indenture. Instead of invalidating EPC's actual right or title, the Court accepted that for the purpose of its memorandum in order and looked at whether or not my clients were a BFP. And that's what the Court did. That's the remainder of its analysis. And in doing that, the Court was very clear on the law and what you look at when you determine a BFP. First off in this case, Your Honors, there was no actual notice. It wasn't even alleged in the complaint. So their other two notices deal with what we refer to as constructive and inquiry. Importantly also, Your Honors, is the burden. In this instance, the West Virginia courts are very clear that the burden rests with the one who's challenging someone who says they don't have notice. That burden is not an easy burden. Some of the language it speaks to is most show facts and circumstances which clearly indicate notice. That language is there because, just as you indicated, Judge Wilkerson, it's to provide sanctity to the recording statute. It's there to protect folks that get good, clean title, record and do what's right, and not to have somehow have it attacked later as it was in this particular instance. So in this, when we looked at the constructive notice, you look at whether or not there was something in the chain of title that would have put them on notice that there was a competing interest. There was none. Judge Stamp looked at the respective instruments and found there was none. Next, the Court went on to the inquiry notice. Now, with constructive notice, there was this argument that you referred to, the 1996 Cobham-Penswell assignment, memorandum assignment. The judge looked at that, and that was the big argument below, that that somehow put my folks on notice that they only got oil. They didn't get the gas. And I submit to you, Your Honor, that could not be any more clear of what it means. The language is pretty comprehensive. Yes, sir. Right on point. It doesn't take much to read it. It's a very short document. It says you get the oil and gas, and it refers to the leases on Exhibit A and the wells on Exhibit B. That's what that document means. That's what Judge Stamp looked at, and clearly the Court found that would not put anybody on notice that there was some severance of the oil and gas estate. There's a real easy remedy to this. You simply put it in the document. It wasn't done. So, therefore, there was no constructive notice. The last area that the Court looked at was inquiry notice. Now, it's important to understand the general rule in West Virginia when you talk about this particular area. The general rule is that if you do have clean title and you have no actual notice, you can rely on the record. You can rely on the fact of what you saw in the record room or what is imputed to you, and that's it. There are exceptions, but that's the general rule. And the exceptions are, in the cases that deal with this, are when there is something in your chain of title that indicates there's a competing interest. That did not happen here. What my folks did when they purchased this property is what you're supposed to do. They go to the property. They look at the property. Understand this is 3,800 acres, close to 6 miles of property in rural, mountainous West by God Virginia. It is not easy to find any type of gas wells in this particular area. So, there was nothing that would trigger inquiry notice, and that's why the Court, when it looked at this, it was looking, do you have facts that would put a reasonable, prudent man on inquiry of the existence of a competing interest? And the Court found none. That's why it could rule it's a matter of law on this, and that's why it did. It did its gatekeeping role in inner judgment in favor of. . . Counsel. Yes, sir. Would you, obviously, quite eloquently or forcefully argue your client's side, but would you allow, though, that at least the structure of the document gives some pause as to why Exhibit B is awkwardly stated, notwithstanding the broad language of the transfer, would you appreciate or allow that at least that does give some structural pause in reading that? Your Honor, not to be recalcitrant, I would not. You would not. You're not giving up an inch. I really can't give up an inch because I still don't understand it, really, in the terms of the argument they're making. And the reason is you look at the granting language, first and foremost. And in the granting language, yeah, you look at the whole document. So it's very difficult for me to look at a gas well that has an oil rights next to it and somehow say you severed a gas and oil estate for this entire transaction. So I can't. I can't. With all due respect, I just don't see it at all. I've not seen it since I got into this case, and I don't see it today. So then later on, then, when you do later on, years later, search, is that like Thomas Jefferson says, you're changing one's mind, you have a right to be smarter today than you were yesterday? You did find something else. We did. They were doing certified title to build and drill a Marcellus well, which is about a $4 million or $5 million undertaking. And so there was certified title was done. There was not actually anything in the record about getting the document. No one actually got the document. There was additional research done. On the whole thing. Yes, and to figure out where this came from. So it wasn't very clear. What, just because there was more money at stake at that point? Well, Your Honor, there was more money at stake. That is very true. You're absolutely right. But I don't think that, and I do think that you looked at certain things and you did get certified title. We did not get certified title when we did the acquisition in 2004. But nonetheless, we did have Mr. Starkey, as indicated by Judge Wilkinson, went to the courthouse to see that the lease was good. He did what we call a leasehold search to see that it was a valid lease. Your Honor, just with respect to the inquiry notice, I think that each argument raised by EPC in this case with respect to that was thoroughly addressed by Judge Stamp. And he did it in a very methodical way. He went through the Pennzoil assignment, the Pennzoil column assignment, which we discussed, said no, there's nothing there. They talked about the existing wells, and we learned that there were two wells on a very rural piece of property. These were not like recently drilled wells. These are very old wells or shallow wells on 3,800 acres of property that no one had seen. And the court recognized that given the fact that you could do a site view and you would never find these wells, the court found that that would not raise it to the level of doing additional inquiry. The legend and lore is exactly what it is, legend and lore. And in fact, the individual that termed legend and lore, he was the one that actually went to the courthouse and didn't see the severance. In fact, I think he testified that he never had seen this alleged severance and never had dealt with it in his practice as a title attorney. Is there anything further, sir? I think we know you. Okay, Your Honor, I appreciate it. There is nothing further. Thank you very much. Maybe my colleagues have some questions. Do you have any, John? No, we don't. Thank you, Your Honor. We thank you. Mr. Lawrence, we're happy to hear from you in rebuttal. Thank you, Your Honor. Two points I'd like to make. First, with respect to the memorandum of assignment, opposing counsel criticizes and says that the drafter of this document, Mr. Kirsch, should have put in the document that the rights conveyed for the Blackshear lease were limited to oil. We submit to the court that is exactly what he did. In the granting language, it could not be clearer. The granting language says, sell, transfer, assign, and convey unto assignee all right, title, and interest it may have in and to certain oil and gas leases. On Exhibit B, the only reference in this document to rights conveyed with respect to this Blackshear lease, it does not say O&G. It does not say oil and gas. This document, this conveyancing document, indicates that the rights that were being conveyed by Pennzoil for the Blackshear lease were the oil rights. Under this document, by which plaintiff claims title, it is made crystal clear by the drafter the only rights being conveyed in the lease were the rights to the oil. We submit that the lower court was in error when it rejected the very provision put into the document by the drafter of the document. The second point is with respect to the inquiry notice. Two cases that we've noted for the court, one is the 2012 case from the West Virginia Supreme Court. In that case, the court was dealing with an unrecorded interest in a surface piece of property. And the court said the purchaser was not a bona fide purchaser who took the title free from this unrecorded interest. The court said based upon the due diligence that should have been When the purchaser failed to do that, they did not qualify as a bona fide purchaser. The Judge Keeley? The inquiry notice concept, I understand it's a part of West Virginia law and everything, but it makes me a little bit nervous. Sort of like constructive discharge means there's no actual discharge. And then they use the term inquiry notice because there was no actual notice. You can go a little bit far with that. We certainly recognize that, Your Honor. We're not asking you to do that. We're asking you to look at exactly what Mr. Starkey did when the stakes were increased when a well was going to be drilled. He performed a title search and he visited this property. He went around the courthouse. Judge Stamp made a finding that he performed his due diligence. But how did he find it the second time? We submit that he did not do his due diligence. There were no additional factors that were available to him the second time. The second time, he simply testified that he actually did a full-blown due diligence. We submit he closed his eyes to that the first time around, and he was obligated. He did not meet his due diligence standards. He ignored the legend and lore. He knew in 2004 that the legend and lore indicated that the oil and the gas estates had been separated. He made no inquiry, even though he knew Mr. Kirsch, who drafted the 2004 assignment, he made no inquiry to him of what was intended by that or whether there were unrecorded deeds. I don't know, Counselor. You've got a lot to deal with in this case. You know, you've got the opposing party does have an unbroken chain of title and it was recorded, and you're coming in with a wild card. And you've got that 1996 memorandum, which as far as I can see, I've heard the various views on it. As far as I can see, it doesn't split off oil and gas right. And then you've got a finding on the part of the district court that Mr. Starkey did conduct due diligence. I'm not all that sure what more he could have done. It just seems like you've got a lot to contend with, a lot of winds blowing against you. But, Your Honor, the 1996 assignment very clearly says under the rights that were conveyed for this lease that it was limited to oil. It did not say oil and gas. That alone was sufficient notice that should have caused Mr. Starkey, based upon the other information that he knew, to perform the same level of title search that he did later. My time has expired. May I conclude, Your Honor? No, we thank you, sir. Thank you. We'll come down and shake hands.
judges: J. Harvie Wilkinson III, Roger L. Gregory, John A. Gibney, Jr.